IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MICHAEL THOMAS PERDUE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 7:12-CV-00373 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Michael Thomas Perdue ("Perdue") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for supplemental security income ("SSI"), and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Specifically, Perdue alleges that the Administrative Law Judge ("ALJ") in his case improperly weighed the medical opinion of her treating physician, Dr. Nicholas Zeltvay, and that additional evidence submitted to the Appeals Council warrants remand.

This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed and argued all issues, and the case is ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, the arguments of counsel, and the applicable law. I conclude that substantial evidence supports the ALJ's decision and that the additional evidence submitted to the Appeals Council does not warrant remand. Accordingly, I **RECOMMEND DENYING**

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

Perdue's Motion for Summary Judgment (Dkt. No. 13), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 16.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Perdue failed to demonstrate that he was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Perdue bears the burden of proving that he is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[2] (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

In cases such as this, where the claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence, this court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings. Wilkins v. Secretary, Dep't of Health and Human Servs., 953 F.2d 93, 95–96 (4th Cir. 1991).

## STATEMENT OF FACTS

### Social and Vocational History

Perdue was born on February 18, 1969 (Administrative Record, hereinafter "R." at 156), and was a younger person on his alleged onset date. R. 17; 20 C.F.R. § 404.1563. Perdue's last

---

[2] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a).

insured date is December 31, 2012. R. 12. He must show that his disability began before that date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Perdue completed 8th grade and attended special education classes throughout his schooling. R. 256. Between 1986 and 2001 Perdue worked as a veneer call and edge bander for Lane Company, classified as unskilled, medium level work. Perdue then worked as a window assembler for MW Windows between 2002 and 2007, classified as medium, semi-skilled work. R. 34–37, 179. Perdue reported that during the relevant period, he had the capacity to walk his dog, go shopping, take his son to the bus stop, run errands for his mother-in-law, go to the movie theater, eat out with his family, go to church every Sunday, talk on the phone, make meals for himself, mow the lawn with a riding mower, do yard work. R. 40, 45, 188, 190–91.

## Claim History

Perdue protectively filed for SSI and DIB on November 10, 2008, claiming that his disability began on May 5, 2008. R. 156. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 79–97. On November 23, 2010, Administrative Law Judge ("ALJ") Joseph T. Scruton held a hearing to consider Perdue's disability claim. R. 27–53. Perdue was represented by an attorney, Carolyn Furrow, at the hearing, which included testimony from Perdue and vocational expert Mark Hileman. R. 27.

On December 7, 2010, the ALJ entered his decision denying Perdue's claims. R. 10–18. The ALJ found that Perdue suffered from the severe impairments of psychotic disorder, bipolar disorder, and borderline intellectual functioning. R. 12. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 13. The ALJ further found that Perdue retained the RFC to perform a full range of work at all

4

exertional levels that consist of non-production oriented work activity and which requires following only short, simple instructions that are primarily verbal in nature, involve very few written instructions, and work not requiring a significant amount of writing. R. 14–16. The ALJ determined that Perdue could not return to his past relevant work as a production window assembler and edge bander (R. 16), but that Perdue could work at jobs that exist in significant numbers in the national economy, such as cleaner II and night housekeeper/cleaner. R. 17. Thus, the ALJ concluded that he was not disabled. R. 18. On June 27, 2012, the Appeals Council denied Perdue's request for review (R. 2), and this appeal followed.

## **ANALYSIS**

Perdue makes two arguments in the present appeal. First, Perdue alleges that the ALJ erred by failing to give proper weight to the opinion of Dr. Nicholas Zeltvay, Perdue's treating psychiatrist. Second, Perdue argues that remand is warranted based on additional evidence submitted to the Appeals Council, more specifically a letter from Dwight Colley, PsyD., MP dated April 17, 2007.

### **Treating Source Opinion**

Perdue alleges that the ALJ erred by improperly discrediting the treating source opinion of Nicholas A. Zeltvay, D.O. of the Piedmont Community Service Psychiatric Clinic, dated April 22, 2010. In the clinic note, Dr. Zeltvay diagnoses Perdue with psychotic disorder and mood disorder, borderline intellectual functioning, history of head injury at age 5, obesity, and gastroesophageal reflux disease. R. 801. Dr. Zeltvay further noted:

> The patient is stable and is tolerating his medications well. His psychotic break 5 years ago though severe, is currently in remission. I believe that Mr. Perdue could never return to production work at any factory and work of this nature would likely lead to recurrence of psychiatric morbidity. I do not feel that he is capable of working in any competitive environment that is available to him given his

5

educational background and cognitive deficits that are independent of his psychiatric condition.

R. 801.

The ALJ acknowledged Dr. Zeltvay's April 2010 assessment of Perdue, but stated that the "opinion pre-supposes a knowledge of vocational factors that are not readily apparent solely from his medical qualifications, addresses an issue that is reserved to the Commissioner, and is not supported by the physician's own clinical findings or the record as a whole…." R. 16. Accordingly, the ALJ gave Dr. Zeltvay's opinion little weight. The ALJ did, however, account for the portion of Dr. Zeltvay's opinion that Perdue should avoid production work in the final RFC. R. 14. I find that, based on the record, the ALJ was entitled to give Dr. Zeltvay's opinion little weight and that the ALJ's decision as a whole is supported by substantial evidence.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in

weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010).

In this case, the ALJ's decision to give Dr. Zeltvay's opinion little weight is supported by substantial evidence in the record. The relevant medical evidence shows that Perdue had an unremarkable mental health history until March 16, 2007, when he suffered a psychotic break resulting in felony abduction charges. R. 264, 409. At an initial evaluation on June 14, 2007 by Mary Kiser, PAC of Walnut Avenue Associates diagnosed Perdue as having brief psychotic disorder with marked stressors and learning disabilities. R. 409–10. Perdue neither showed any evidence of delusions or paranoia on that date, nor did he report any hallucinations. Perdue's thought processes were linear, and his insight, judgment, and cognition "seem[ed] to be fairly intact." R. 410. Kiser did not want to put Perdue on any medication "due to the fact that he is currently stable" and wrote that she believed that the incident on March 16, 2007 was "a psychotic break that has no longer affected this patient." R. 410. Perdue's diagnosis remained unchanged through November 2007 (R. 398–408) although Perdue was placed on Geodon, an anti-psychotic medication. R. 408.

On March 20, 2008, Michele D. Ebright, Psy.D. conducted a state temporary custody evaluation and recommended that Perdue was not in need of inpatient hospitalization but did recommend outpatient treatment to prevent any deterioration in Perdue's condition. R. 262. Perdue reported that "he was simply going through a bad emotional period" as a result of mounting stressors at the time of the psychotic break, and Perdue stated that "[h]e does not believe that he has a long-term, major mental illness." R. 260. Perdue expressed his desire to return to work, and Dr. Ebright found this plan to be beneficial, noting that Perdue "ha[d] a history of good occupational functioning and a return to work would provide Mr. Perdue with a

stable source of daily structure, as well as enabling him to maintain his role as a financial provider for his family." R. 261. A similar evaluation by Dr. Husam Alathari from the same time period yielded a similar recommendation of out-patient treatment. R. 275.

After Perdue's criminal charges were resolved by a finding of not guilty by reason of insanity on December 19, 2007 (R. 264–66), Perdue was court-ordered into counseling and was required to meet weekly with a crisis worker. R. 547. At his first session with Piedmont Community Services on May 2, 2008, Perdue reported that he had been maintaining his emotional stability through compliance with his medicine, and that he anticipated returning to his job soon. R. 547. A few days later M. Rizwan Ali, M.D. of Piedmont Community Services diagnosed Perdue with bipolar disorder and a global assessment of functioning ("GAF") of 60. R. 563–64. Dr. Ali noted Perdue's mental status to be largely normal, although Perdue looked anxious. R. 563.

Perdue continued to make court-ordered therapy visits on a weekly basis. When Perdue returned to his job at MW Windows in May 2008, he reported anxiety from being overwhelmed by the work and his superiors. R. 545. Progress notes from Piedmont Community Services from around the time of Perdue's alleged onset date of May 5, 2008 show that Perdue functioned above baseline, although medication was adjusted due to mild daytime sedation. R. 539, 552, 554–55. Perdue was put on sick leave from work because of the "grogginess" from medications. R. 555. By June 11, 2008, Perdue reported improved functioning and no sedation problems. R. 551. Treatment records show that Perdue's mental health progressed and stabilized through the end of 2008, although he was unsuccessful in finding employment. For example, on August 26, 2008, treatment notes state that Perdue "maintained a level of emotional stability commensurate

to that of times before the onset of his condition" but that he "continue[d] to meet the realities of the local economic situation." R. 514.

Richard J. Milan, Ph.D., a state agency consultant, conducted a Mental Residual Functional Capacity Assessment on December 26, 2008. R. 571–86. Dr. Milan found that Perdue was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." R. 573. According to Dr. Milan, Perdue was capable, among other things, of understanding and remembering instructions; concentrating for extended periods of time; interacting with others appropriately; adapting to changing workplace activities; maintaining regular attendance; and that he could be expected to work normal work days and weeks. R. 573.

Perdue's progress continued into 2009. On April 20, 2009, Perdue exhibited symptoms of depression (R. 598) although it appears from treatment records that Perdue had been confused about his Geodon dosage around that time period. R. 597.

Perdue first saw Dr. Nicholas A. Zeltvay, a consulting psychiatrist with Piedmont Community Services, on January 29, 2009 for a follow-up visit for routine medication management. R. 590. At that time, Perdue reported that he'd been "doing well," his mood had been good, and had been taking his medications. R. 590. Dr. Zeltvay was "unable to elicit any type of delusional theme" and found Perdue to be oriented to place and time, but functioning at the margin of mild retardation and borderline intellectual functioning. R. 590. Dr. Zeltvay recommended Perdue continue his treatment plan and stated that "[a]t this time I do not believe that the patient is likely to be able to engage in gainful employment based on his past five year history at least." R. 590.

9

Perdue saw Dr. Zeltvay next on April 30, 2009. R. 589. Both Perdue and his son indicated that Perdue had been doing better emotionally, and that Perdue had experienced less anxiety and depression. R. 589. Dr. Zeltvay noted that there was "no evidence of acute psychotic process," and recommended continued medication and a follow up appointment. R. 589. At the follow up appointment on August 3, 2009, Perdue reported to Dr. Zeltvay that he was "doing quite well psychiatrically" and Dr. Zeltvay found "no evidence of any acute psychiatric distress." R. 796. At Perdue's next visit with Dr. Zeltvay at the end of October 2009, Perdue stated he was "doing fairly well" and did not report problems with his medication. R. 798. Again, Dr. Zeltvay did not find any evidence of psychiatric distress, and determined that Perdue was "near or at his psychiatric baseline." R. 798. Perdue did not see Dr. Zeltvay again until April 22, 2010, when Dr. Zeltvay expressed his opinion of disability on which Perdue relies for this appeal.

In reviewing the totality of the record, I find that the ALJ's decision is supported by substantial evidence. Overall, the record shows that Perdue's mental health stabilized relatively soon after his psychotic episode leading to his criminal charges and that through medication Perdue has been able to function nearly commensurate his pre-episode levels. Mary Kiser, PAC noted that while his criminal charges were pending Perdue was doing well on medication but expressed some anxiety at his production line job and surrounding his court dates. R. 399–400, 404–06. Also supporting the ALJ's decision are the progress notes detailing his extended treatment with Piedmont Community Services from May 2008 to April 2009. These progress notes show that Perdue had few setbacks in his mental health recovery following his psychotic episode. Perdue had some issue with grogginess from medication in June 2008 (R. 539, 551–52) and that Perdue regressed due to a misunderstanding about his medication dosage in April 2009. R. 597–98. It appears that Perdue recovered quickly from both of these problems. Additionally,

10

Dr. Milan performed a state agency consultative exam in December 2008 and found that Perdue was able to meet the basic mental demands of competitive work. R. 571. This longitudinal history of stabilized mental health cuts against Dr. Zeltvay's opinion of disability.

When Perdue returned to his window production job in May 2008 he expressed anxiety due to his superiors' expectations, and was thereafter put on sick leave because of grogginess from his medication. After an adjustment in medication, Perdue's mental health stabilized but he did not return to his past job. However, he sought alternative employment with the encouragement of his counselors, albeit to no avail. This evidence suggests that Perdue's difficulty working was limited to production-type work, or perhaps just even his specific work environment at MW Windows. Dr. Dwight T. Colley's April 2007 letter soon after the criminal behavior, submitted to the Appeals Council, also supports this. Dr. Colley stated that "[i]t is felt something at his jobsite, be it environmental or social created the offense situation to play itself out in his mind, leading to this criminal behavior." R. 803. The ALJ properly credited in formulating Perdue's RFC the portion of Dr. Zeltvay's opinion supported in the record: that Perdue could never return to production work.

Moreover, internal inconsistencies in Dr. Zeltvay's treatment notes and opinions, appropriately considered by the ALJ in his opinion, call into question his April 2010 opinion's credibility. Dr. Zeltvay's April 22, 2010 opinion stated that Perdue was stable, tolerating medications well, and that the psychotic break is in remission. These findings and observations were a continuation of his benign findings for the previous year, where Dr. Zeltvay found Perdue to have improving and stabilized mental health. R. 589, 796, 798. Despite these benign findings, Dr. Zeltvay determined a much bleaker outlook of Perdue's ability to return to the workforce. Dr. Zeltvay further stated in his April 22, 2010 opinion that *independent* of Perdue's psychiatric

11

condition, he could never be capable of working in a competitive environment. The medical evidence shows that Perdue is limited cognitively and suffered a major head injury at an early age, but Perdue worked for more than two decades in competitive work with these limitations. The ALJ's final RFC accounted for these cognitive limitations, providing that the work require only "short, simple instructions that are primarily verbal in nature, involve very few written instructions (which would need to be very basic in nature), and work not requiring a significant amount of writing." R. 14.

Finally, Perdue's hearing testimony conflicts with Dr. Zeltvay's opinion. Perdue testified at the administrative hearing that his medication has helped him recover from the 2007 psychotic break. Perdue stated that he did not have any episodes in the year prior to the hearing and that the medicine "really does the trick." R. 45. Also, Perdue could not articulate why he could not return to work, other than "[j]ust being at work, stress and stuff like that." R. 45–46. Perdue later indicated that the stress was associated with his superiors demanding he speed up his production pace (R. 48), a consideration the RFC accounted for.

The weight of the evidence in the record reflects that Perdue has largely recovered from his psychotic break, but that he is functionally limited by the stressors of production line work and his cognitive impairments. Dr. Zeltvay's opinion that Perdue is incapable of working in any competitive environment is contradicted by a considerable longitudinal mental health history and even his own clinical observations. The ALJ appropriately credited Dr. Zeltvay's opinion that Perdue should not return to production work and incorporated that opinion into Perdue's RFC along with Perdue's educational background and cognitive ability. Given the evidence set forth in the record, I find substantial evidence supports the ALJ's decision to give Dr. Zeltvay's opinion little weight when determining Perdue's RFC.

## Appeals Council Evidence

Perdue argues in the alternative that remand is warranted to properly consider additional evidence submitted to the Appeals Council. Specifically, Purdue submitted a letter dated April 17, 2007 from Dwight T. Colley, a licensed clinical psychologist which Dr. Colley sent to Perdue's criminal defense attorney as part of his criminal case. Dr. Colley stated that Purdue suffered from "organic brain damage that appears to have affected both the frontal and occipital loves of his brain." R. 803. According to Dr. Colley, the behavior that led to Purdue's criminal charges was a "result of this brain abnormality that was beyond his control." R. 803.Dr. Colley further stated that the condition had been developing over a period of time, that there was something about his jobsite "be it environmental or social" that led to the criminal behavior, and that if he stayed away from his job that he would not be a threat to the community. R. 803–04. Dr. Colley also stated that Purdue did not require hospitalization.

When deciding whether to grant review, the Appeals Council must consider additional evidence, "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 95–96 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Id.

When the Appeals Council denied Perdue's request for review, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981. As such, this court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings. Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991.) "However, the Fourth Circuit has also

admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the evidence." Davis v. Barnhart, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005)(citing Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996)). Thus, when faced with new evidence, a court must reconcile its duty under Wilkins to review the entire record including the new evidence to determine if there is a reasonable possibility that it would change the outcome, with its obligation under Smith to abstain from making credibility determinations and resolving factual conflicts. Davis, 392 F. Supp. 2d at 751.

Courts in this district have achieved that balance by reviewing the record as a whole to determine if the new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports. If the new evidence creates such a conflict, there is a reasonable possibility that it would change the outcome of the case, and the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence. If such conflicts are not present, the case can be decided on the existing record without a remand. Id. (citing Bryant v. Barnhart, No. 6:04cv000017, 2005 WL 1804423, *5 (W.D. Va. Jan 21, 2005); Smallwood v. Barnhart, No. 7:03cv00749, slip op. at 2 (W.D. Va. Oct. 19, 2004); Ridings v. Apfel, 76 F. Supp. 2d 707, 709 n. 6 (W.D. Va. 1999); Thomas v. Commissioner, 24 Fed. Appx. 158, 162, 2001 WL 1602103, at *4 (4th Cir. 2001)(unpublished opinion)); McConnell v. Colvin, No. 2:02cv00005, 2013 WL 1197091, at *7 (W.D. Va. March 25, 2013).

Although the letter properly relates back, I find that the letter from Dr. Colley does not warrant remand because it is neither new nor material. It is not new because it is apparent from the rest of the record that Perdue had brain damage stemming from a severe head injury when he was five years old. Indeed, both Temporary Custody Evaluations specifically referenced Dr. Colley's conclusions when reviewing his medical history, and the fact that a May 2007 MRI of

14

Perdue's brain "produced unremarkable findings." R. 261, 274. The import of Dr. Colley's findings and opinion was before the ALJ at the time of his decision, and therefore is not new evidence.

Dr. Colley's letter is also immaterial, as there is no reasonable probability that it would change the outcome of the case. The letter, written to Perdue's defense attorney with a criminal charge pending, focuses on Perdue's ability to control his actions at the time of the criminal behavior and his danger to the community at the time. Thus, the letter contemplates the issue of an insanity defense and release from pre-trial detention, rather than a statement of disability or functionality. Colley's opinion that Purdue did not require inpatient treatment also comports with the Temporary Custody Evaluations performed by the state. Moreover, as stated above, the letter tends to support the ALJ's decision that it was something about production work or that jobsite specifically that caused Perdue's behavior. The letter does not contradict any evidence in the record, does not provide material competing testimony, and does not call into question any part of the ALJ's decision. In the face of the longitudinal history detailed above, it is clear that Dr. Colley's letter would not alter the outcome of the case. It is therefore not material.

As Dr. Colley's letter is neither new nor material, I find that substantial evidence in the record, when viewed as a whole, supports the Commissioner's decision to deny benefits.

## Conclusion

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Samuel G. Wilson, United

States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof.  Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

    Enter:  January 27, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge